14-1862 Tina Varlesi v. Wayne State University et al. Oral argument not to exceed 15 minutes per side. Mr. Hudson for the appellants. Good morning. May it please the court, Paul Hudson on behalf of the Wayne State University appellants. Your honors, I'd like to reserve three minutes for rebuttal. You may please proceed. Your honors, Wayne State's defense in this pregnancy discrimination case was that the plaintiff failed out of its social work program not because she was pregnant but rather because she received poor performance reviews during her second year there. The plaintiff argued at trial that the jury shouldn't believe these performance reviews because all through her first year at Wayne State she was a stellar student, had high GPA, good performance reviews, and the only thing that changed, according to her, was that she got pregnant. And so the only thing that explained the bad performance reviews was pregnancy discrimination. The primary issue on appeal is whether the jury should have been permitted to hear evidence that something else had changed and something quite significant. And that was that right before her second year at Wayne State, the plaintiff's uncle resulted in her fiance calling off their wedding and ultimately the plaintiff being admitted to the hospital for panic attacks and suicidal thoughts. This was on August 21st, 2007. Classes started for the second year just a couple weeks later. Now, your honors, we recognize that the court is rightly deferential to jury verdicts, but we ask for a new trial or to remit the jury verdict here because this evidence went right to the heart of the case and really in two fundamental ways. The government, excuse me, Wayne State was able to bring out that she, her, the wedding was called off? The only testimony was that the fiance's husband had left her. And this is a critical point. I the fact that the person she was having an affair with was the husband of her aunt or something like that? No, your honor. And let me be crystal clear. All of this was excluded except for the fact that the fiance had left her and the key ruling by the district court. And this is key because the plaintiff argues that we could have probed further on this. Record entry 180 page 79, 79, 22 quote, as I understand the court's rulings, I also cannot ask questions regarding the circumstances of the breakup of the engagement. Is that correct answer? That's correct. And then after the proffer where we set forth the full circumstances, the district court again rules. The court's finding was all was also that all of this was more prejudicial than probative. That's record entry 186 page 88 71. So none of this came in your honor. But she went on to say, unless Miss for Lacey opens the door that was that was before trial, that was a ruling. Um, and then when cross examination came, Miss Norris asked the court specifically, um, whether the plaintiff had opened the door and and the district court ruled no, she had not. And so none of this was your best argument for why she did why she best argument on the record for why she opened the door and you should have been allowed to cross examine her. Two reasons, your honor. First is that it was directly relevant to her claim for emotional distress. She testified on the stand that she was distraught and devastated by this, and even that she didn't enjoy having her son because of the Wayne State defendants. And under overwhelming case law, when it when plaintiff puts her emotional distress at issue, the defendant is entitled to rebut that. And that's from the bidet and other cases from this circuit and cases throughout the country. And your rebuttal that she was subject to a broken engagement and a broken marriage did not fully satisfy your ability to show that there was another reason for her emotional distress. That's correct, your honor. Because why not? Because we were not permitted to explain to the jury the circumstances of this when it happened specifically, which was just weeks before her performance dropped. And so the plaintiff was able to argue unrebutted to the jury that the only thing that explained why she was so good her first year and then so bad her second year, supposedly, was that she got pregnant. And that was the theme they hammered at opening statement. They quoted from her performance reviews the first year. And then the key quote from the opening statement is, quote, but members of the jury, then something happened. She finished her first year. This is where she stood. Then something happened. And the something, they explained, was pregnancy discrimination. So this evidence cut to the heart of the... And your something response is, no, she had a broken engagement and lost a planned wedding. Why doesn't that give you the same sort of prejudicial information that the reason was because she was having an affair with her aunt's husband? The explanation that we should have been able to use to rebut her claim that we made up the performance evaluation was she was going through an extremely traumatic time to the extent of being admitted to the hospital. And this was directly contemporaneous. This was August 21st. Her performance problems started immediately on her second year just a couple weeks later, just a couple weeks after that. Here's what I'm confused by. My understanding is that you were able to get into the fact that her fiance and the father of her child left her. No, Your Honor. The jury didn't know that? The jury heard, I think, three fleeting comments that the father had left her. And it was sort of phrased as... Wait a minute. Either they heard it or they didn't hear it. They heard that, yes. So they heard that. They heard about her health issues, did they not? No, they did not. Not at all? They did not hear that she was admitted to the hospital, that she had mental health issues, that she was suicidal, that she had called the police because her aunt had threatened to kill her. They heard none of that. How about deaths of close family and friends? Did they hear about that? I don't believe so, Your Honor. No. How about the birth of her son and her being a single mother? Yes, they heard that, yes. And they heard that she was upset about this litigation and the appeal? Yes, they heard that, yes. Okay, so they didn't hear about the hospitalization? Correct. Now, there was a hospitalization in 2002, right? Yes, that's correct. And this case involved actions in 2000 and what? 2007. And the hospitalization. Was there another hospitalization that was more, aside from the birth of her son, that was more close to this incident? Yes, there was a hospitalization on August 21st, 2007, two weeks before she started her second year there. Alright, so you're appealing about the exclusion of both 2002 and 2007 hospitalization? That's correct. But the case for the 2007. Alright, and then the second major area is the reason for the in other words, i.e. the identity of the relative? That's correct, and the circumstances of that and why it was so traumatic and why it explained a drop-off in her performance immediately in September of 2007. You got about seven or eight issues, whatever the number is that you raised, and we've spent almost all of your time now talking, because you raised it, talking about these two or three exclusions from what the jury was permitted to hear. Is there anything else that, you can argue this any way you want, but is there anything else you want to argue about? Your Honor, I hope to sort of streamline the arguments today. We've addressed the other issues with respect to the future damages in the briefs. I'm happy to rest up the briefs on those unless the court has questions, but I think Okay, so the biggie from your perspective was the exclusion of certain relevant evidence? Yes, because it went directly to her claim for emotional distress damages. She received a $500,000 jury award only for emotional distress, and the case law is clear that when a plaintiff puts their emotional distress in controversy, that the defendant is entitled to rebut that with alternative contributing sources of emotional distress. And, you know, was this evidence prejudicial to her? No question, but not unfairly so, and it certainly didn't outweigh the probative value. The probative value is at its apex because it directly rebuts her claim for emotional distress damages and directly rebuts the central theme of her case, which was that nothing else explained these bad performance reviews. Wayne State was lying about these performance reviews. Nothing explains it except for pregnancy. Was there actual direct evidence really unrelated to those particular reviews, such as her oversight, the person charged with her oversight in these two placements? You know, one of them asked her if she was married and evidently said, well, I bet your parents are happy about that, that you're pregnant and unmarried. I mean, some pretty clear direct evidence attributing impropriety to her because of her unwed pregnancy. Your Honor, I think that's a crucial point, and the standard, and I know you know this area of the law very well, is not whether there were comments made about pregnancy, even if we think they were stupid. The question is whether Wayne State failed her because she was pregnant, because of pregnancy discrimination. But direct statements, you know, we're talking about the conceptual basis of direct testimony versus inferential testimony, and her allegation is that I have direct testimony. And those weren't direct statements because they were made by her field supervisors, not by anybody at Wayne State, and they also didn't... Well, there was a dispute about whether the Wayne State individual or her field supervisor is the one who started talking about the impropriety of wearing tight clothes when you're pregnant, and whether that creates improper consideration by the men at the VA. Wasn't there a dispute on who said that? There was some dispute on who had said it. The question of the case is whether they failed her because she was pregnant. And on that, I mean, this isn't a typical employment case where an employer is trying to skirt maternity obligations or didn't want to deal with a reduced schedule worker. Pregnancy discrimination is not limited to skirting obligations. The question is, is there evidence in the record supporting the determination that the reason she got the poor reviews was that she was pregnant? And our position is that, had this evidence not been excluded, that if the jury had heard another explanation for why her performance dropped so precipitously during her second year, that this would have been a different trial, because... Let's stop right there for just a second about whether her performance actually dropped for any reason, aside from the allegation of pregnancy discrimination. Am I right that neither Stefanski nor Primo kept any notes during this period whatsoever that documented her performance, good or bad? I believe there were emails at the time. Primo didn't do emails. She didn't do emails. That's correct. So she couldn't have emails. No, I think that's correct. But it's undisputed evidence. And am I right that both the director and the dean admitted that they covered up here and that they lied when they said they did an investigation and there wasn't an investigation? No, your honors. That's not true? No, that's not true. The record shows that her performance problems surfaced immediately. That Carol Primo, the... When you say the record show... I understand that people said that she had performance problems, but I'm having trouble finding records that corroborate that. I mean, they're saying as early as three weeks before, geez, that's great, I knew you were a star, and then three weeks later she fails. Well, the performance problems, your honor, went all the way back to the first semester. And those are documented in the record by Mackey's performance evaluation. And it's really a scathing review. And that's in the record at 56-12, page ID 1410. Those are exhibits I and J to the trial. Those were back in the semester prior. And she said she was disheartened by Ms. Farlisi's disrespect shown to the veterans of the country. Greatly concerned for the safety and well-being of any population with which she may be in contact. That's the placement that she was allowed to leave early? Yes, that's correct. The placement for which they passed her. That's correct. The record shows sort of an act of extreme charity on that. She admitted that she could have been failed based on that first semester's poor performance. And all of those performance problems surfaced before she even found out she was pregnant, before she made any comments about pregnancy discrimination. And then the second semester comes around and she has the exact same problems again with her supervisors, not completing assignments. All right. Anything further? Judge Batchelder, any questions you have? No, I think not. Thank you. All right. Thank you. You'll have your rebuttal. Good morning, Your Honors. Deborah Gordon on behalf of the plaintiff at Pali. My client, Ms. Farlisi, and her parents are here with me today. Let me cut right through this. There is a major misrepresentation. It does kind of look like there's two different cases that were being tried here. One you described and one Mr. Hudson described. Well, the record speaks for itself. And we have the record completely on our side, 100%. There's a major misrepresentation going on here with regard to the key issue just raised by Mr. Hudson. He wants this court to believe that he was precluded from getting into other stressors or medical treatments. Defendants say they were stopped from offering evidence. This is 100% incorrect. They made a strategy decision. It's very clear that they were going to steer clear of certain questions. Now they want this court to misread the record and they want to mispresent it to you. Let's look. Courts speak through their orders. There is literally no order in this case of any kind nor a request from us in the form of a motion that they could not get into my client's emotional distress, other stressors, family problems, medical treatment and the like. I thought there was a motion. There was. I'm just going to get to that. We asked for two very discreet things. One was on the engagement and we said, have at it Wayne State. My client throughout the trial talked about being left at the altar, being ditched. The way she described it while she was pregnant. That's uncontested that came in. What Judge Hood said could not come in or was the deep background, the very embarrassing details about another sexual relationship. So that was one point. The second point was an O2 very brief hospitalization which predated all of this by six years. Those two things alone. Look at docket number 18. But Mr. Hudson said there was also a 2007 hospitalization. Right, that was fair game. That was completely fair game. And he says that he was precluded from that. Absolutely not. I'm going to give you the docket. So your position is he wasn't excluded, he just decided not to ask questions about it? Well, he didn't try the case. Megan Norris said yes. Absolutely, it's uncontested, it's uncontroverted. Just look at the court orders. Look at docket 118, which is based on our motion in limine, docket 91. We have a very discreet motion in limine. The court grants a very discreet order. And it says very specifically that the facts behind the breakup of the engagement will not come in. Nor will the O2 hospitalization come in. Here's my motion in limine. There are health records remote to this time having to do with an O2 hospitalization. They are very sensitive in nature. That's my point number one. Point number two, and that was from Havenwick Hospital in O2. The next thing we say in our motion in limine, docket 91, plaintiff does not object to defendants eliciting from a plaintiff at trial the fact that her engagement was called off in 07, but objects to any attempt to get into the highly personal whys of that. Now here's the court's order. The court's order at docket number 118. It says these two things will be excluded. Evidence of plaintiff's, I'm sorry, they're going to let in the internship. Number two, the judge says you cannot get into the O2 hospitalization and you cannot get into the details of the affair. Now let's move forward. We're now at trial. Ms. Norris now has a chance to get into every other thing that she remotely would like to do. I would like to tell this panel, the Judge Goldsmith who originally had this case, when Ms. Norris asked for an IME of my client, which I'll be happy to talk about in a moment, asked her, why didn't you ask the plaintiff at her deposition? Why didn't you ask her a single question about her emotional distress damages? And she really had no good answer for that. Now we're standing at trial and we all know what the order says, docket 118, and Ms. Norris gets up and says, Ms. Gordon just opened the door. And what she means by that is I had asked a series of questions about how my client had felt in being thrown out of school and having her dream career go away. What I had not asked was, are you under psychiatric care today for that? Are you going to be under psychiatric care for life? Do you have post-traumatic stress disorder? Do you have a diagnosed psychological condition? All of that could have been opening the door. And in a moment I'm going to tell you what I did ask about because I've got my questions with me. So Ms. Norris gets up and says, well, I've got it right here. It's docket 180. It's page 7922. She says, good morning, Your Honor. I understand the court's ruling on medical records. That means Havenwick O2. But she uses the term medical records. But the only ruling that's ever been made is Havenwick O2. She uses the word medical records. She said, I understand the court's ruling. I also cannot ask questions regarding the circumstances of the breakup. Is that correct? The court says, that's correct. I think it's more prejudicial than provative. That's the colloquy. Now Ms. Norris begins her exam of my client. Your Honors, she asks not one single solitary question about Tina Varlisi's emotional distress. I've never seen that happen in a trial. I was stunned. Here's what she could have asked about. Were other things stressful, Ms. Varlisi? I understand you've had anxiety attacks. Am I correct on that? Did you have a panic attack three days before all of these events? Were you really upset about being pregnant and being ditched? What medication have you been on, Ms. Varlisi? And what counseling have you had? Were you hospitalized in 2007? What about family problems? She did list tangentially that there had been deaths in the family, but not for emotional distress. She could have asked all of that. But, members of the panel, it was a strategy. She didn't want to go near it with a 10-foot pole. She probably didn't want to engender sympathy. I don't know. Or maybe she wanted to be able to come in here and say, I wasn't allowed. A court speaks through its orders. If you're a trial lawyer and you want to ask about something and you know darn well this has been the subject of motions and there's a written order, certainly you would say to the trial judge, Your Honor, here's the order. These are the only two things I'm not allowed to get into. She chose not to do that. And now she's here wanting it both ways. Now let me read you the trial judge's new trial opinion when she revisited this, defendant revisited this. At trial, the court precluded questions by the defense regarding the 07 engagement and the 02 hospitalization. The court initially found the evidence relevant but more prejudicial than probative. The court granted plaintiff's motion on these two issues. At trial, plaintiff testified regarding her emotional distress as a result of Wayne's actions. Wayne State sought clarification from the court as to whether plaintiff opened the door. Counsel for the parties argued the matter. The court ruled that plaintiff did not open the door. And she references back the one medical record in the engagement breakup. That's docket 169. And she finishes this way, docket 169, page 6587. The court did not preclude the defense from questioning the extent of her emotional distress or to test plaintiff's credibility on cross-examination. A new trial is not required on this issue. So everybody seems very clear about what was going on in the courtroom except for the defendants in this case, who I really think are intentionally misrepresenting this. And as I said, I've said several times now, made a strategy decision at the trial with regard to what they were going to do and not do. And I would also like to just tell you for a moment about what I asked my client about. This goes to a couple of different issues in the case. I asked her to talk about how humiliated she felt about being thrown out of the program. I asked her to talk about what it was going to be like for the rest of her life. This is part of her life story now. I was thrown out of a school. I didn't get a degree. Those were the kinds of things we focused on in her examination. Never once did we open the door, which was what the initial concern was, that she was suffering from post-traumatic stress disorder or something to that effect. So that's on that. With regard to the credibility, defendants make this, I think, a little bit of an odd argument that they wanted to test my client's credibility because in Interrogatory 5 she had listed all of her hospitalizations. That's a non-starter. First of all, they could have asked her about it. Secondly, Your Honors, the interrogatory asked for hospitalizations from 06 forward. This hospitalization was in 02. With regard to their claim that it affected liability, like what happened to Tina? Maybe she was under stress. Nobody in this case has ever argued that Tina's performance went down because she was under stress. But in any event, they could have argued that as well. One other thing on damages. These defendants asked for an independent medical exam, an IME, way back in July of 2011. This case was not tried until January 2013. At that time, Judge Goldsmith talked a lot about good cause and the elements that the Supreme Court and the Sixth Circuit look at and how we don't want it to become routine where every time somebody loses a job, there becomes a battle of the experts on how upset were you. He ruled at that point, Look, I'm going to deny your motion, defendant, for an IME without prejudice. Without prejudice. In the meantime, go do what you're going to do. I know you're getting all the plaintiff's medical records. They got every record under the sun. Come back just within 90 days before trial. Members of the panel, that was utterly abandoned by defendant. So again, they want it both ways. They had another crack at bringing in their own expert to talk about my client's damages, and they chose not to. One of their arguments is that the damages for future pay, that they're just speculative. What is your response to the speculative nature and the law that would support your side? I would look to the Urban v. West Publishing Corporation Sixth Circuit case, Your Honor. Which says very specifically, while the determination of the precise amount of the award of front pay is a jury question, the initial determination is made by the court. Here, the district court's determination must turn on the exact circumstances of the case. It's a very fact-intensive analysis, which our trial judge did make here. I would first point out to you that we got, I think, a modest number in future wage loss. It was $200,000, even though it's our position in the case that by my client losing her ability to obtain a master's in social work degree, she was going to lose significantly more. They gave us a modest amount of $200,000. So awards of front pay must be guided by certain factors, a duty to mitigate. We had a phone book size exhibit. I think it's exhibit either 49 or 51 of everything my client did to seek other jobs and to also get into other programs. They argue that much of that was just boilerplate information that was available for the public and not things that she had undertaken. That's totally false. Let me see if I've got my mitigation list here. Excuse me. My client extensively sought employment. I'll just go through a quick list of page numbers for you. 7768, Michigan Government Works. 7769 from the transcript. She filed 32 applications with social work agencies. She had three to four interviews. She applied to a place called Four Chaplains, a nursing home. That's page 771. Easter Seals, Youth Villages, Nordstrom's Retail, the Judson Center, Alzheimer's Association. She worked at Talbot's and Coach. She applied as a pharmaceutical sales rep. That's 7781. And she then began to work with Jewish Vocational Services, 7789, to get placed. That's just a part of it. So my client, who lived with her parents, desperately wanted to get a job, but she now had this mark on her record that she'd been dismissed from a program, so that became a factor. They're just incorrect. We had a lengthy discussion from the witness stand about all of the mitigation, and the trial judge, of course, weighed that before she made her ruling, Judge Strange, that this could go to the jury. Let me go back to my future damages. The defendant bears the burden in these cases, Title VII or Title IX, in showing that the plaintiff lacked diligence in mitigating damages. And again, why didn't they call an expert? If they wanted to say, and I've had this in cases, you know, there's a multitude of things you could have done, plaintiff. Sometimes people bring in their own, either economic expert or somebody that has expertise in job search. They chose to do none of that. That is their burden. There was more than sufficient evidence here for the jury to consider whether she mitigated her damages. And I do want to just... I want to belie one other thing that defendant is arguing in their record. They say that my client testified that for the rest of her life she was going to be emotionally distraught, and they say that that was improper. I want to let the court know that that is not what happened. What Ms. Varlisi said was, now that this chapter is over with this trial, I believe I will be able to do better. What I said to the jury was, it will always be a part of her life story that she was thrown out of Wayne. I don't know that she'll ever get over that. But Ms. Varlisi never testified that these damages would haunt her for the rest of her life. And I think the reason the jury gave the number they gave is that what happened to Ms. Varlisi at Wayne State was so utterly outrageous, including the no investigation in spite of multiple filings with the proper authorities, being lied about, desperately trying to get your one week from graduation. It was just an outrageous thing she had to endure. And then the appeal... And I think the jury really felt for her, and that's why they gave her what they did. But the jury was thoughtful. They parsed down the economic damages right to the penny. I think they gave me $172 and some change for back pay. I'm waiting for you to pause here. I'm paused. Thank you. Thank you, Your Honor. Your Honors, I'd like to clear up the issue of whether Wayne State could have asked further questions about the circumstances of the 2007 engagement being called off. In addition to making rulings before trial and during cross-examination that we couldn't probe into these any further, we then did an entire proffer on this issue after the cross-examination was done. The proffer went on for 5 or 6 pages of the transcript. There's not a dispute that the court ordered that not to be gone into. The dispute is whether the court ordered you not to go into the 2007 hospitalization or other, because, I mean, isn't that the distinction? There's no question that the court said to you, you may not go into the circumstances behind the breakup of her engagement. The proffer, which went on for several pages, several minutes, related to the 2007 hospitalization, the circumstances of the engagement being called off. That was the whole point of the proffer. And then at the close of that, Judge Hood ruled that it was all more prejudicial than probative. So I don't think there's any ambiguity there that Wayne State was not permitted to ask questions related to the circumstances of the end of the engagement. This is on page record entry 186, page ID 8871. The proffer began on page 8860. The whole proffer related to the circumstances of the 2007 end of the engagement. The ruling was not limited only to the 2002 hospitalization. Your Honors, we think that, at a minimum, the damages award relating to emotional distress needs to be remitted here, because Wayne State simply was not permitted to make any rebuttal to the argument that she suffered a million dollars worth of emotional distress due to Wayne State. And in the Madej case, in the Tenth Circuit's York v. AT&T case, quote, because plaintiff chose to raise a claim of emotional distress, it was entirely appropriate for the court to allow the defendants to introduce evidence of alternative or multiple causes of such distress. As this court put it in the Bryan v. Martinez case, cited in the brief, quote, if plaintiff wanted to keep the reports out, she should not have claimed damages for emotional distress. That's exactly what we have here. It's overwhelming authority. I think we cited 14 cases in our brief. The only case cited by the plaintiff was an unpublished case from Missouri, and that related to sexual propensity evidence where the defendants tried to admit evidence that it wasn't a sexual harassment hostile work environment because the plaintiff had had sexual relations with other coworkers. So the overwhelming case law is that if a plaintiff claims emotional distress of any kind, and it doesn't matter if it's the garden variety or otherwise, the defendant is entitled to rebut that with evidence that other factors contributed. And here it's, I mean, a pretty strong, it would have been pretty strong evidence to counter her testimony that she didn't enjoy having her son and that she was devastated by this, to present evidence to the jury that, you know, there were some extremely traumatic other incidents going on in her life that surely contributed to this. All right, thank you. Any questions, Judge Batchelder? No, thank you. Thank you very much. All right, that completes the oral argument in this case. You've both cited to a lot of different things in the record. We'll go back and check all of those sites and take the case under consideration. Thank you very much. That's the only other case we had argued this morning.